Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Mar 10 2014, 10:28 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT J.W.:

**AMY KAROZOS**
Greenwood, Indiana

ATTORNEY FOR APPELLANT L.W.:

**DANIELLE L. GREGORY**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
**DAVID E. COREY**
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF L.W. and J.W., Children in Need of Services, and | ) ) ) |
| J.W. (Father) and L.W. (Mother), | ) ) |
| Appellants-Respondents, | ) ) |
| vs. | ) No. 49A02-1308-JC-700 ) |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) |
| Appellee-Petitioner. | ) ) |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Marilyn A. Moores, Judge
The Honorable Rosanne Ang, Magistrate
Cause Nos. 49D09-1305-JC-16139 and 49D09-1305-JC-16140

**March 10, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**

J.W. ("Father") and L.W. ("Mother") appeal the trial court's adjudication of their minor children, L.W. and J.W., as children in need of services ("CHINS"). The dispositive issue for our review is whether the evidence supports the trial court's determination that the children were CHINS pursuant to Indiana Code Section 31-34-1-1. Concluding that the evidence does not support the trial court's determination, we reverse the CHINS adjudication.

**Facts and Procedural History**

Father and Mother have been married for sixteen years and have two children, L.W., born in March 1998, and J.W., born in April 2000. Father was diagnosed with bipolar disorder in 1998. In 2000, when L.W. was two years old and J.W. was nine months old, Father swallowed sixty prescribed Zoloft pills in an attempt to gain attention from doctors because he believed that he was not "being heard." Tr. at 8. He believed that ingesting the large amount of Zoloft would not kill him but would just make him sick. In 2001, while the family resided in Michigan, Father was determined to be permanently disabled due to his bipolar disorder and began receiving social security disability payments. Father was on Medicaid, which covered his psychiatric treatment and his medication. That coverage, however, transitioned to Medicare after two years, which resulted in Father needing to rely on Mother's health insurance from her employment.

The family moved from Michigan to Indiana in 2012 because Mother began working at IUPUI. Upon arrival in Indianapolis in September, Father immediately sought mental-

health treatment. Mother's new health insurance required that he receive a mental-health referral from a primary-care physician. After receiving a referral, Father obtained the first available psychiatric appointment at the Neuroscience Center in December 2012. During that appointment, Father was prescribed a two-month supply of Zoloft.

Father took his medication as prescribed. However, in February 2013, Father had back surgery and was immobile for four weeks. During that time, his Zoloft prescription ran out. Because he had problems getting the Neuroscience Center to follow up with him to get a new prescription, Father went to see his primary-care physician in order to get a new psychiatric referral. Father got a new referral and scheduled a psychiatric appointment for July 2013, the first available appointment. In the meantime, Father continued to receive treatment from his primary-care physician, but that physician did not feel comfortable prescribing psychiatric medication.

Fourteen-year-old, L.W., who was also diagnosed with bipolar disorder, had been receiving mental health treatment in Michigan since the fourth grade. While residing in Michigan, L.W. had been prescribed medication, but he took the medication for only one month and then refused to continue. Upon arriving in Indianapolis, Father and Mother arranged for L.W. to receive treatment and therapy with child psychologist Ann Lagges at Riley Hospital Child and Adolescent Psychiatry Clinic. Because L.W. still had many of the same behavior problems that he did in Michigan and because he did not react favorably to the move to Indianapolis, in addition to seeing Dr. Lagges at Riley, Father and Mother had L.W.

3

participate in faith-based counseling every Wednesday with the youth pastor at their Indianapolis church.

Also upon their arrival in Indianapolis, Father and Mother became concerned that J.W. was depressed and having a hard time coping with the deaths of a relative and a close family friend. Accordingly, Father and Mother arranged for J.W. to also receive treatment and therapy from Dr. Lagges at Riley.

On May 18, 2013, Mother and L.W. got into a disagreement because L.W. was being disruptive. Father confronted L.W. about his behavior, and L.W. left the home. Mother was upset and blamed Father that L.W. had left. Father then grabbed a bottle of old prescription medicine and headed to the bathroom. Mother thought that Father was going to take the pills so she yelled for J.W., who was in another room, to call 911. Father stated that he was just going to flush the pills down the toilet and voluntarily gave the bottle of pills to Mother before police arrived. Police and medical personnel arrived on the scene. Although Father denied trying to kill himself and signed a waiver stating that he did not wish to go to the hospital, Father was detained and forced to go to Community East Hospital. At the same time, Mother was arrested for assaulting a police officer who responded to the home and was taken to the Marion County Jail. Father was released from the hospital later that day. Mother was released from the Marion County Jail sometime prior to June 3, 2013.[1]

---

[1] The date of Mother's actual release is unknown. However, the record indicates that Mother was served with a hearing notice at the family home on June 3, 2013.

4

Because both parents had been taken from the home and were unavailable to care for L.W. and J.W., the Marion County Department of Child Services ("DCS") took the children into custody and recommended that the children be removed from the home. The children were placed in the care of a relative. On May 20, 2013, DCS filed a verified petition alleging that L.W. and J.W. were CHINS. The petition alleged that Father has bipolar disorder, which is currently untreated, and that Father had attempted suicide in J.W.'s presence. The petition further alleged that L.W. has bipolar disorder, which is also currently untreated, and that court intervention was required for L.W. and J.W. to receive therapy and services that they could not or would not receive without court intervention. The trial court found that L.W. and J.W. should remain in relative care and scheduled a factfinding hearing for June 28, 2013. Prior to the factfinding hearing, the trial court granted DCS's motion for authorization for continued placement in foster care for L.W. after the relative caregiver requested the removal of L.W. from the home due to threats L.W. made to the caregiver's wife.

At the factfinding hearing, Father and Mother both appeared by counsel. Father testified regarding his mental health treatment in Michigan and his treatment since the move to Indianapolis. He stated that he received psychiatric treatment in Michigan and that he sought and received treatment and medication after the move. Father testified that he had been medicated for his bipolar disorder from December 2012 until February 2013. Father explained his efforts and frustrations in obtaining mental health treatment from his original provider and testified that he had scheduled the first available appointment with a new psychiatrist for July 11, 2013.

The family's original DCS case manager, Dwayne Lockridge, testified that he met with Father at Community East Hospital after the incident on May 18, 2013. Lockridge testified that Father denied trying to kill himself. Lockridge stated that Father admitted that he is often depressed due to his bipolar disorder but that, although he had been on medication in the past, he was experiencing difficulty getting his psychiatrist to follow up with him, so he was not medicated at the time of the incident. Lockridge stated that he was unaware of whether Father had taken any steps to obtain future mental-health treatment.

The family's current DCS case manager, Melody Burnett, testified that when she spoke with Father, he denied trying to kill himself and that Father stated that he was "actually just showing J.W. if he was going to commit suicide this is what he would do." *Id*. at 70. Burnett admitted that she had no knowledge of Father's mental-health treatment, past or present. Burnett stated that it was unnecessary for DCS to provide therapy or services to L.W. or J.W. because the children were already receiving the therapy that Father and Mother had arranged prior to DCS's involvement. Regarding the children's mental-health treatment, Burnett agreed that "literally nothing has changed since DCS took these children from [Father and Mother]." *Id*. at 81. Nevertheless, she believed that DCS's involvement was necessary "for mental health concerns" for everyone in the family "besides the mother." *Id*. at 72.

At the conclusion of the hearing, the trial court determined that both L.W. and J.W. were CHINS. Thereafter, on July 22, 2013, the trial court entered its order with findings of fact and conclusions thereon. A dispositional hearing was held on July 23, 2013. The court

ordered that L.W. remain in foster care and J.W. remain in relative care. Father and Mother each appealed.

## Discussion and Decision

Father and Mother contend that the trial court's adjudication of the children as CHINS is clearly erroneous. Indiana courts recognize that parents have a fundamental right to raise their children without undue influence from the State, but that right is limited by the State's compelling interest in protecting the welfare of children. *In re Ju.L.*, 952 N.E.2d 771, 776 (Ind. Ct. App. 2011). A CHINS proceeding is a civil action in which the State bears the burden of proving by a preponderance of the evidence that a child meets the statutory definition of a CHINS. *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010); Ind. Code § 31-34-12-3. To meet its burden of establishing CHINS status, DCS must prove that the child is under age eighteen and that

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
> (A) the child is not receiving; and
>
> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

Ind. Code § 31-34-1-1.

Our supreme court recently noted that the fact that a child's needs are unlikely to be met without coercive intervention is perhaps the most critical of the considerations when

7

determining whether the State's intrusion into the ordinarily private sphere of the family is warranted. *In re S.D.*, No. 49S05-1309-JC-585, 2014 WL 553475, at *3 (Ind. Feb. 12, 2014). Indeed, "[t]hat final element guards against unwarranted State interference in family life, reserving that intrusion for families 'where parents lack the ability to provide for their children,' not merely where they 'encounter *difficulty* in meeting a child's needs." *Id.* (quoting *Lake Cnty. Div. of Family & Children Servs. v. Charlton*, 631 N.E.2d 526, 528 (Ind. Ct. App. 1994)). The *S.D.* court explained eloquently,

> [CHINS] cases aim to help families in crisis—to protect children, not punish parents. Our focus, then, is on the best interests of the child and whether the *child* needs help that the parent will not be willing or able to provide—not whether the *parent* is somehow "guilty" or "deserves" a CHINS adjudication. But that help comes not by invitation, but compulsion—imposing the court's "coercive intervention" into family life. And a CHINS adjudication may have long-lasting collateral consequences for the family. The intrusion of a CHINS judgment, then, must be reserved for families who *cannot* meet those needs without coercion—not those who merely have difficulty doing so.

*Id*. at *1.

When reviewing the sufficiency of the evidence to support a CHINS adjudication, we will not reweigh the evidence or judge witness credibility and will consider only the evidence favorable to the judgment and the reasonable inferences raised by that evidence. *In re M.W.*, 869 N.E.2d 1267, 1270 (Ind. Ct. App. 2007). When the trial court enters findings of fact and conclusions thereon as the court did here, we consider whether the evidence supports the findings and whether the findings support the judgment. *Parmeter v. Cass Cnty. DCS*, 878 N.E.2d 444, 450 (Ind. Ct. App. 2007). We will not set aside the findings or judgment unless they are clearly erroneous. *Id*

8

Although both Father and Mother direct us to individual findings which they believe are unsupported by the evidence, we will concentrate our review on the findings and judgment as a whole. Our review reveals that the crux of this CHINS adjudication revolves around Father's alleged failure to obtain sufficient mental-health treatment and the possible future negative effect that the lack of treatment may have on L.W. and J.W. Specifically, the trial court concluded that "[t]he failure of [Father] to receive the necessary mental health treatment resulted in an incident wherein at least one of the children was under the belief that he had attempted suicide." Appellant's App. at 80. Moreover, the court determined that "[w]ith no indication that mental health treatment has been received to prevent future similar incidents, [L.W. and J.W.] need care, treatment, or rehabilitation that [they are] not receiving and is unlikely to be provided or accepted without the coercive intervention of the court." *Id.*

However, even when the evidence is viewed most favorably to the trial court's judgment, we can only conclude that Father and Mother have experienced some difficulty in obtaining and maintaining appropriate mental-health treatment for Father—not that they are unlikely to obtain it without the court's compulsion. Indeed, the record indicates that Father and Mother have been reasonably diligent in addressing Father's mental-health issues, and have done so without the State's coercion. Prior to DCS's involvement with this family, Father was proactive about seeking mental-health treatment and obtaining medication for his bipolar disorder. Indeed, while it appears that Father has had difficulty in maintaining consistency with that treatment due to various factors, including a change in doctor and appointment availability, Father continued to be treated by his primary care physician. And,

9

at the time of the factfinding hearing, Father had already scheduled a psychiatric appointment to obtain additional medication. Regarding the children's mental health, the record is clear that, prior to DCS's involvement, Father and Mother had sought and obtained mental-health treatment and therapy for both L.W. and J.W. and that both children continue to receive that treatment.

Undoubtedly, the record reveals that Father and Mother each made poor decisions on May 18, 2013, which resulted in both parents being temporarily unavailable to care for their children, prompting DCS to file its petition. However, "[a] CHINS finding should consider the family's condition not just when the case was filed, but also when it is heard." *S.D.*, 2014 WL 553475, at *6. By the time of the factfinding hearing, we cannot say that the evidence demonstrated that Father and Mother were in need of the court's coercive intervention to appropriately provide for L.W. and J.W. Father already had an appointment scheduled and was actively pursuing mental-health treatment for himself, and both children were continuing to receive mental-health treatment and therapy that the parents had in place well before DCS's involvement with the family. Father and Mother appear to be making reasonable efforts to provide for the mental health of all involved. This is something for which we should applaud them rather than condemn them through coercive action. *See In re R.S.*, 987 N.E.2d 155, 159 (Ind. Ct. App. 2013). Simply put, DCS failed to meet its burden of demonstrating that coercive intervention of the court was necessary. The trial court's conclusion to the contrary is clearly erroneous. When coercion is not necessary, the State

may not intrude into a family's life. *S.D.*, 2014 WL 333475, *7. We therefore reverse the trial court's judgment that L.W. and J.W. were CHINS.

Reversed.

BAKER, J., and NAJAM, J., concur.